IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| VALORIE ELAINE SHEPHERD, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. CV 01-B-2382-S |
| | } | |
| PROGRESSIVE METAL FINISHERS, INC., | } | |
| | } | |
| Defendant. | } | |

**ENTERED**

MAR 24 2004

### MEMORANDUM OPINION

Currently before the court is a Motion for Summary Judgment filed by the defendant Progressive Metal Finishers, Inc. In her Complaint, plaintiff Valorie Shepherd has sued her former employer, defendant Progressive Metal Finishers, Inc., alleging sexual harassment in violation of Title VII of the Civil Rights Act of 1964, and invasion of privacy in violation of state law.[1] Upon consideration of the record, the submissions of the parties, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted.

**I.    Factual Summary**

Progressive Metal Finishers ("PMF") is a closely-held company; its primary business is anodizing and finishing aluminum parts. (Doc. 32, Ex. 2 ¶ 2.) PMF employs about 35 people in Bessemer, Alabama. (*Id.*) PMF anodizes and finishes aluminum parts as its primary business. (*Id.*) PMF has an anti-sexual harassment policy, which prohibits sexual harassment and sets

---

[1]Plaintiff also made claims for alleged retaliation and pay discrimination. Plaintiff has abandoned these claims. (Pl. Br. in Opp.'n to Def.'s Mot. for Summ. J. at 15.)



forth the consequences of engaging in such conduct. (Doc. 32, Ex. 2 ¶ 4; Doc. 32, Ex. 1, exs. 6, 8-10.)

Plaintiff was fully aware of PMF's anti-sexual harassment policy, as she signed the employee handbook indicating her receipt and understanding of the policy. (Doc. 32, Ex. 1 at 114-17 and exs. 8-10.) Plaintiff received sexual harassment training in 1998, during which she signed another acknowledgment indicating her receipt and understanding of the policy. (Doc. 32, Ex. 1 at 55-56 and ex. 6.) As of June 1997, plaintiff was aware that she could complain to Human Resources at PMF about any harassment problems and she could directly complain to Jason Turman, PMF's Controller and on-site Human Resource representative. (Doc. 32, Ex. 1 at 54-55; Ex. 2 ¶ 1.) Plaintiff also acknowledged she could complain to Ken Deaver, the President and Owner of PMF. (Doc. 32, Ex. 1 at 55.) Plaintiff testified she had a full understanding of the procedures for reporting sexual harassment; she stated in her deposition: "Well, report the person that's responsible for the sexual harassment. If the person is the manager of the person, you would go over his head." (Doc. 32, Ex. 1 at 55.)

Plaintiff's employment with PMF began in February 1995 as a temporary employee through Manpower, and continued until June 1995 when PMF permanently hired her as a racker. (Doc. 32, Ex. 1 at 46-48.) Plaintiff was a full-time, hourly employee on the day shift. (Doc. 32, Ex. 1 at 48.) Plaintiff's salary began at $6.50 per hour, and periodically increased through pay raises to $9.10 per hour at the time she left PMF. (Doc. 32, Ex. 1 at 38, 48, 142.) Her pay was never reduced. (Doc. 32, Ex. 1 at 142.)

Lab technicians at PMF regularly monitor the chemicals used in the anodizing process. (Doc. 32, Ex. 2 ¶ 6.) Eddie Pryor supervised and worked in the lab and racking area on the day

shift. (Doc. 32, Ex. 2 ¶ 6.) In May or June 2000, one of PMF's full-time lab technicians, Val Gostian, resigned (doc. 32, Ex. 1 at 50), requiring PMF to find an employee to assist the other lab technicians on the day shift (doc. 32, Ex. 2 ¶ 6). In July 2000, Turman decided to place Shepherd in a newly created, split position of racker/lab technician. (Doc. 32, Ex. 1 at 107; Ex. 2 ¶ 6.) Plaintiff's new position required her to work about six hours per day racking, and spend one and one-half hours performing other tasks in the lab. (Doc. 32, Ex. 1 at 80-81.) While working in the lab, plaintiff was not qualified, nor required, to perform skilled tasks such as testing the acid cleaner, adding acid to the brite dip, filling the tanks, adjusting the levels in recovery as needed, setting the parameters, cleaning up spills, determining the amount of water usage, and performing tank draining. (Doc. 32, Ex. 2 ¶ 7.) Full-time lab technicians Bill Irvin and John Andrews performed these jobs, and Pryor had performed them at times as well. (Doc. 32, Ex. 2 ¶ 7.)

There were several instances of plaintiff not calling in to work when she needed to take a day off for sick leave or for another reason. (Doc. 32, Ex. 1 at 84, 118-25; Ex. 2 ¶ 5.) PMF's policy allowed an employee to be terminated for three or more "no call, no shows." (Doc. 32, Ex. 1, exs. 8-10.) During her deposition, plaintiff admitted having at least six or seven "no call, no show" incidents, and she received numerous written disciplinary actions warning her of possible termination if she continued to fail to call in before she was absent from work. (Doc. 32, Ex. 1 at 118-25 and exs. 11-16.) On February 12, 2001, plaintiff received a disciplinary notice when she failed to call or show for work on December 22, 2000. (Doc. 32, Ex. 1 at 124 and ex. 16.) The notice was a "final notice," which stated that if plaintiff was absent from work again

without reporting it prior to work time, she would be terminated. (Doc. 32, Ex. 1 at 124-25 and ex. 16.)

Sometimes plaintiff called in when she was going to be absent, but, on numerous other occasions in 2001, she did not, including March 20-21, 2001, April 19-20, 27, and 30, 2001, and May 1-2, 2001. (Doc. 32, Ex. 2 ¶ 5 and ex. A.) Plaintiff testified she had called in during April 2001 to notify PMF she could not make it to work. (Doc. 32, Ex. 1 at 147-48.) Her telephone records indicate she did in fact occasionally call PMF. (Doc. 32, Ex. 3, exs. A-C; Ex. 4, exs. A-B; Ex. 2 ¶ 5 and ex. A.) However, those records also show she did not call in on April 19-20, 27, and 30, 2001, and May 1-2, 2001. (Doc. 32, Ex. 3 ¶ 4 and exs. A-C; Ex. 4, exs. A-B; Ex. 2 ¶ 5 and ex. A.) PMF recorded these absences as "no call, no show," absences, pursuant to its policy. (Doc. 32, Ex. 1, ex. 8 at 9; Ex. 1, ex. 10 at 6; Ex. 3, ex. A; Ex. 2 ¶ 5 and ex. A.)

On April 25, 2001, plaintiff went to work to pick up her paycheck, and she announced that she would return to work the next day. However, plaintiff failed to show up for work, and PMF treated her as a voluntary quit under its "no call, no show" policy. (Doc. 32, Ex. 1 at 125; Ex. 2 ¶¶ 5, 9.) When PMF employees have many "no call, no shows," they are deemed to have voluntarily quit under PMF's attendance policy. (Doc. 32, Ex. 1, ex. 8 at 9; Ex. 1, ex. 10 at 6; Ex. 2 ¶¶ 5, 10 and ex. A.)

While plaintiff was absent from work in April, PMF lost one of its major accounts, resulting in a layoff of approximately twenty-five employees–almost 50% of PMF's workforce. (Doc. 32, Ex. 2 ¶ 8.) As a result, PMF eliminated its night shift. (Doc. 32, Ex. 2 ¶ 8.) John Andrews, a lab tech supervisor on the night shift who had more seniority than plaintiff, was retained to work the day shift in the lab. (Doc. 32, Ex. 2 ¶ 9.) PMF reassigned plaintiff to a full-

time racking position, with no loss of pay or benefits. (Doc. 32, Ex. 1 at 140; Ex. 2 ¶ 9.) Plaintiff's direct supervisor, Eddie Pryor, called plaintiff on April 25, 2001, to explain PMF's restructuring decision. (Doc. 32, Ex. 1 at 138-40.) Due to her absences in April 2001, plaintiff was not aware of the layoffs resulting from the loss of the account. (Doc. 32, Ex. 1 at 146.)

Plaintiff refused to move back into a full-time racker position, stating her left hand would not be able to handle the work. (Doc. 32, Ex. 1 at 140.) To accommodate plaintiff, Turman authorized Pryor to allow plaintiff to perform light-duty work, which included sweeping and performing general cleaning duties for the same pay. (Doc. 32, Ex. 1 at 140-41.) Plaintiff refused, and she never returned to work at PMF. (Doc. 32, Ex. 1 at 139; Ex. 2 ¶ 9.) PMF did not formally terminate plaintiff. (Doc. 32, Ex. 1 at 146; Ex. 2 ¶ 5.)

In this lawsuit, plaintiff alleges her supervisor, Eddie Pryor, sexually harassed her. (Doc. 32, Ex. 1 at 68-82, 94-99, 106.) However, she only reported one incident of alleged harassment which allegedly occurred on March 1, 2001, to PMF management. (Doc. 32, Ex. 1 at 60.) On March 1, 2001, plaintiff fell on steps coming from the lab. (Doc. 32, Ex. 1 at 61.) She suffered minor bruising, but told Turman she wanted to continue racking parts, which she did. (Doc. 32, Ex. 1 at 61-64.) After about an hour and a half, plaintiff's back began to hurt, and she decided to go to the plant office to request a medical slip to see a doctor. (Doc. 32, Ex. 1 at 67-68.) During this walk to the plant office Pryor allegedly touched plaintiff. (Doc. 32, Ex. 1 at 70-71.) As she and Pryor were walking from the racking area to the plant office (Doc. 32, Ex. 1 at 72) plaintiff alleges Pryor touched her "on my buttocks, my back, my breast," and he said to her, "do it hurt here, do it hurt there, do it hurt there." (Doc. 32, Ex. 1 at 60.) Pryor allegedly touched plaintiff "softly" for ten to twenty seconds. (Doc. 32, Ex. 1 at 71.)

Once plaintiff reached Turman's office, she requested a doctor's note for her back, and Turman typed a worker's compensation claim form. (Doc. 32, Ex. 1 at 74-75.) Plaintiff also requested that Turman tell Pryor to "keep his hands off [her]." (Doc. 32, Ex. 1 at 58.) Plaintiff did not explain to Turman what Pryor had done, and she never said anything about sexual harassment: "I just asked him to ask Eddie to keep his hands off of me." (Doc. 32, Ex. 1 at 69, 74-75.)

Plaintiff stated in her deposition that (1) Pryor touched and stared at her breasts on one occasion in March 2001 in the lab while she typed a report, but admitted that it was possible Pryor was looking at what she was typing and not at her breasts (Doc. 32, Ex. 1 at 96); (2) in March 2001, when plaintiff was mixing paint, Pryor allegedly touched her buttocks and asked her, "what is the going price" (*Id.* at 81); and (3) at different times during her employment, Pryor allegedly made comments about her panties being too tight (Doc. 32, Ex. 1 at 89-90). Although plaintiff knew of PMF's sexual harassment policy, she never reported any other alleged sexual harassment to PMF management.[2] (Doc. 32, Ex. 1 at 55-57, 90, 93-94, 99-101, 106 and ex. 6.)

In her deposition plaintiff acknowledged the workplace was generally "good," and employees often told jokes, including some with sexual content that she thought were funny. (Doc. 32, Ex. 1 at 88-89.) Plaintiff also testified she did not think sexual jokes told by Pryor and others were inappropriate. (Doc. 32, Ex. 1 at 88.)[3]

---

[2]Plaintiff testified that other employees witnessed the paint mixing incident and the panties comment. These witnesses deny having personal knowledge of any such conduct by Pryor. (*See, e.g.* Doc. 32, Ex. 9 ¶¶ 5-8; Ex. 5 ¶¶ 5-7; Ex. 7 ¶¶ 5-8; Ex. 6 ¶¶ 5-8; Ex. 8 ¶¶ 5-8.) However, for Summary Judgment purposes, the court assumes these incidents occurred.

[3]Defendant offered evidence that plaintiff grabbed the buttocks of co-worker Willie Battle and referred to the size of Battle's penis, as well as the penis size of another employee,

In her amended complaint, plaintiff asserts a claim for quid pro quo harassment, contending that she was demoted and terminated because she refused to have sex with Pryor. (Doc. 5 ¶ 5.) Plaintiff did not make this allegation in her EEOC charge (Charge No. 130A11894). (Doc. 32, Ex. 1 at 24; Ex. 1, exs. 3-4.) In her deposition, defendant asked plaintiff about every alleged instance of harassment by Pryor, but she did not testify that Pryor demoted and/or terminated her because she refused to have sex with him. (Doc. 32, Ex. 1 at 105-06.)

The record before the court indicates that Turman, not Pryor, made decisions regarding plaintiff's pay and job assignments (Doc. 32, Ex. 1 at 106-07, 159). These included the decision to treat her unexcused absences as a voluntary quit under PMF's "no call, no show" policy, as well as the decision to reorganize the work force after losing a large account in April 2001. (Doc. 32, Ex. 2 ¶ 10.)

## II.     Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if

---

J.W. Laister. (Doc. 32, Ex. 5 ¶ 8; Ex. 7 ¶ 9.) Plaintiff denies these allegations and for purposes of summary judgment the court will assume the incidents did not happen. In any event, the evidence is not relevant, because the court does not get to the issue of whether any improper conduct was unwelcome.

the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III.  Discussion

#### A.  Sexual Harassment Claim

##### 1.  Hostile Work Environment Sexual Harassment

Plaintiff contends Pryor's harassment of her created a hostile work environment. To establish a sexually hostile work environment, plaintiff must show she was subjected to sexual harassment "severe or pervasive enough to create . . . an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Plaintiff must prove not only that she perceived the environment to be hostile and abusive because of her sex, but also that a reasonable person would perceive the environment to be hostile. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068 (2000)); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1981). Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment" such that an abusive working

environment is created. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). The Supreme Court has suggested using "common sense" to distinguish between unlawful and lawful conduct for sexual harassment purposes. *Id.* at 82 (explaining that common sense and the particular social context in which the action occurs will aid the court in deciphering what amounts to harassment).

When determining whether harassment is severe or pervasive, courts examine whether the conduct was objectively and subjectively severe or pervasive to alter the employee's terms or conditions of employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). In *Mendoza*, the plaintiff presented four categories of harassing conduct, including verbal comments, physical contact, noises directed toward plaintiff, and following and staring at plaintiff in an "obvious fashion." The court found the conduct fell short of being severe or pervasive enough to alter the terms or conditions of employment. 195 F.3d at 1247.

Here, plaintiff reported only one alleged incident to PMF management. As noted above, on March 1, 2001, Pryor, plaintiff's supervisor, was walking to the plant office with plaintiff when he allegedly touched her buttocks, back and breast after plaintiff complained of pain from falling down and injuring herself earlier in the day. Pryor asked, "do it hurt here, do it hurt there" each time he "touch[ed] her softly." (Doc. 32, Ex. 1 at 60, 71.) Plaintiff admits the incident only lasted between ten and twenty seconds. (Doc. 32, Ex. 1 at 71.)

It is clear that the alleged conduct of Pryor on March 1, 2001, standing alone does not constitute actionable sexual harassment under Title VII. However, plaintiff testified in other depositions to other acts of alleged harassment: 1) Pryor touched and stared at her breasts on one occasion in a lab while she typed a report; 2) on one occasion Pryor touched her buttocks and

asked "what is the going price;" and 3) at different times during her employment, Pryor allegedly made comments about her panties being too tight.

In evaluating whether alleged harassing conduct is sufficiently severe or pervasive, courts must examine: (1) the frequency of the conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely offensive; and (4) whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23; *Gupta*, 212 F.3d at 584; *Mendoza*, 195 F.3d at 1246. Even assuming all plaintiff's allegations, the conduct does not rise to the level necessary to establish a hostile environment based on plaintiff's sex. A reasonable person would not find it severe, it was not physically threatening or humiliating, and it did not unreasonably interfere with plaintiff's work performance. Because the alleged harassment was not, as a matter of law, sufficiently severe or pervasive to create a hostile work environment, defendant is entitled to judgment as a matter of law.

    **2.**    **Quid Pro Quo Harassment**

Although plaintiff asserts a quid pro quo claim in her Amended Complaint (Doc. 5), she did not assert this claim in her EEOC charge and questionnaire, nor did she assert any quid pro quo harassment claims in her deposition or brief. (Doc. 32, Ex. 1, exs 3-4.) Even assuming plaintiff had filed an EEOC charge alleging quid pro quo harassment, plaintiff does not refer to any tangible adverse employment action specifically tied to any alleged harassment. (Doc. 32, Ex. 1, ex. 4.)

    **B.**    **Invasion of Privacy**

Plaintiff also alleges a state law invasion of privacy claim. Her claim is based upon the previously mentioned incident that occurred between she and Pryor while walking to the plant

office after she fell on March 1, 2001. Under Alabama case law, employers are liable for torts committed by their employees if (1) an employee acts within the line and scope of his employment, or (2) the employer ratifies, confirms, or adopts the employee's unauthorized wrongful conduct. *Sparks v. Regional Medical Center Bd.*, 792 F. Supp. 735, 748 (N.D. Ala. 1992) (citing *Moman v. Gregerson's Foods, Inc.*, 570 So. 2d 1215, 1216 (Ala. 1990)). Under Alabama law, sexual conduct by an employee is generally considered to be personal and not within the line and scope of employment. *Brewer v. Petroleum Suppliers, Inc.*, 946 F. Supp. 926, 933 (N.D. Ala. 1996) (citing *Doe v. Swift*, 570 So. 2d 1209, 1211 (Ala. 1990)). Assuming for purposes of this claim alone that Pryor sexually harassed plaintiff, Pryor's act was not within the line and scope of his employment, and PMF is not responsible for that act unless it ratified, confirmed, or adopted Pryor's act. There is no evidence that is did so. Based on the evidence before the court, PMF is not liable for invasion of privacy under Alabama law.

IV.     **Defendant's Request for Attorneys' Fees, Costs and Expenses**

In defendant's briefs in support of its Motion for Summary Judgment, defendant states that it is entitled to an award of its costs, expenses and attorneys' fees. Defendant does not state whether it seeks fees against plaintiff, plaintiff's counsel, or both, and whether it seeks sanctions and/or fees pursuant to Rule 11 of the Federal Rules of Civil Procedure and/or pursuant to 42 U.S.C. § 1988. If defendant wishes to pursue its request for fees, it should file a motion on or before **April 19, 2004.**

V.      **Conclusion**

For the reasons stated herein, the court is of the opinion that no genuine issues of material fact exist and defendant is entitled to judgment as a matter of law. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this the 24th day of March, 2004.

_____
**SHARON LOVELACE BLACKBURN**
United States District Judge